**Opinion issued December 6, 2018**



In The

# Court of Appeals

For The

# First District of Texas

———————————————

**NO. 01-17-00920-CR**

**NO. 01-17-00921-CR**

**NO. 01-17-00922-CR**

———————————————

**JAMES DOYLE COLLINS, JR., Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

On Appeal from the 300th District Court
Brazoria County, Texas
Trial Court Case Nos. 76666-CR, 76667-CR, 76668-CR

**MEMORANDUM OPINION**

A jury found appellant, James Doyle Collins, Jr., guilty of three separate offenses of possession of child pornography[1] and assessed his punishment at confinement for five years and a fine of $10,000, confinement for five years and a fine of $10,000, and confinement for ten years and a fine of $10,000, to run concurrently. It then recommended that his ten-year prison sentence be suspended and he be placed on community supervision. The trial court, in accordance with the jury's recommendation, suspended appellant's ten-year prison sentence and placed him on community supervision for a period of ten years. In two issues, appellant contends that the evidence is legally insufficient to support his convictions and the trial court erred in denying his motion to suppress his statement.

We affirm.

**Background**

Pearland Police Department ("PPD") Detective C. Arnold, a certified cyber-crimes investigator with the Houston Metro Internet Crimes Against Children Task Force ("ICACTF"), testified that he, through the use of computers in his office, monitors certain file-sharing networks that "exist on the internet" in order to

---

[1] *See* TEX. PENAL CODE ANN. § 43.26(a) (Vernon 2016); appellate cause no. 01-17-00920-CR; trial court cause no. 76666-CR (Offense I); appellate cause no. 01-17-00921-CR; trial court cause no. 76667-CR (Offense II); appellate cause no. 01-17-00922-CR; trial court cause no. 76668-CR (Offense III).

investigate the "distribution and receipt of child pornography."[2]   Arnold receives "a notification when someone [using a file-sharing network] uploads or downloads a [known] child pornograph[y]" image or video, and upon receiving a notification, he views the image or video to determine whether it constitutes child pornography.[3] Arnold then obtains the location of the person using the file-sharing network based on the IP address assigned to that person.

---

[2]   Peer-to-peer file sharing is a popular means of obtaining and sharing files free of charge directly from other computer users who are connected to the [i]nternet and who are also using peer-to-peer file[-]sharing software. . . . Once peer-to-peer file[-]sharing software has been downloaded and installed [on a computer] by the user, the user may interface directly with other computers using the same filing[-]sharing software and browse and obtain files that have been made available for sharing. . . . File sharing occurs when one computer, identified by an Internet Protocol ("IP") address, initiates a search for a responsive file by indicating the term or terms that it seeks to find in the file's name. This is called a 'query' and consists of key words such as 'child,' 'pornography,' or 'child pornography.' . . . Other computers that are using the same file[-]sharing software and connected to the [i]nternet at the time will respond to the query with a 'query hit message.' A query hit message identifies the file or files available for sharing which have a word in the file name that matches the search word in the query. . . . After a query hit message is received, the computer user requesting the file must affirmatively select it for download, generally by double clicking on the file's name.

*U.S. v. Thomas*, Nos. 5:12-cr-37, 5:12-cr-44, 5:12-cr-97, 2013 WL 6000484, at *2–3 (D. Vt. Nov. 8, 2013) (order).

Detective Arnold explained that twenty-six file-sharing networks exist, including "ARES, Limewire, [and] BearWare."

[3]   The "alert" that Detective Arnold receives essentially tells him that in the "geographic area that [he is] monitoring," a particular IP address has "downloaded or uploaded [a certain child-pornography] video[] and picture[]."

In regard to appellant, Detective Arnold testified that on March 6, 2015, his computer "made a direct connection and download [of a known child-pornography video] from an IP address in Pearland, [Texas]." When Arnold viewed the video, he determined that it constituted child pornography. At the time, Arnold did not know the identity of appellant, but based on the IP address associated with the downloaded-child-pornography video, he obtained appellant's physical address. Arnold drove to appellant's residence in Pearland, Brazoria County, Texas, and determined that he had a secure internet connection.[4] Arnold then obtained a search warrant for appellant's residence.[5]

On May 12, 2015, Detective Arnold, along with Homeland Security Special Agents D. Lewis and L. Erickson, PPD Detectives D. Vlasek and J. Cox, and two uniformed PPD patrol officers, served a search warrant on appellant at his residence. Upon arriving at appellant's home, Arnold, along with the other law enforcement officers, "clear[ed] the house" and identified the individuals that were present.

---

[4] Detective Arnold explained that with an "open internet connection . . . someone can [park] in front of your house" and "us[e] your [W]ifi signal [to] access the internet." However, with a secure internet connection, "no one can . . . use your internet connection without [knowing] your password." This is important because if another person can "log into your wireless [internet] signal," then "it would show your IP address and what they[, and not you, were] doing" on their computer.

[5] The trial court admitted into evidence Detective Arnold's affidavit and the search warrant.

4

Arnold and Lewis then interviewed appellant, while Vlasek and Cox "examine[d] and process[ed] all of the electronic[] [devices]" found in appellant's home.[6]

Detective Arnold noted that when he and Agent Lewis spoke to appellant, he was not in custody, was free to leave, and was not placed in handcuffs or in any type of restraints. Despite the fact that appellant was not in custody, Arnold informed him of his legal rights, and appellant waived them, agreeing to speak. Arnold did not coerce appellant, threaten him, or make any promises to him. And he recorded the interview with appellant.[7]

During his interview, which lasted approximately forty-five minutes, appellant stated that he was the only person living in his home and he had downloaded and used, on his electronic devices, certain file-sharing networks,[8]

---

[6]   Detective Arnold explained that Detectives Vlasek and Cox used a "forensic recovery program" to "look[] for obvious signs of child pornography" on appellant's electronic devices. The other law enforcement officers present at appellant's home "split up doing searches in each of the rooms [in the house], looking for items that [might have] contain[ed]" child pornography.

[7]   The trial court admitted into evidence State's Exhibit 2, appellant's audio-recorded interview with Detective Arnold and Agent Lewis.

[8]   Detective Arnold explained that a file-sharing network "doesn't do anything on its own." A person "ha[s] to tell it what [to] look[] for," "ha[s] to tell it to download files," and "ha[s] to manually open files and view them." And a file-sharing network does not appear on a person's computer unless he specifically "download[s] it."

including "ARES,"[9] "BearShare and Bear,"[10] and "Limewire."[11]  When Arnold

questioned appellant about certain terms that appellant may have used while

searching the file-sharing networks, including the search terms "Vicky"[12] and

"PTHC,"[13] appellant admitted that he had in fact viewed child pornography "out of

---

[9] *See Ferguson v. State*, Nos. 09-15-00342-CR to 09-15-00345-CR, 2016 WL 4247956, at *1 (Tex. App.—Beaumont Aug. 10, 2016, pet. ref'd) (mem. op., not designated for publication) (defendant used "ARES file[-]sharing network" to download child pornography).  Appellant admitted to using the "ARES" file-sharing network in 2015.

[10] *See Wiand v. United States*, Nos. 3:10-CV-1420-M, 3:07-CR-352-M, 2012 WL 1033623, at *1 (N.D. Tex. Jan. 17, 2012) (defendant "admitted he acquired . . . child pornography using a file-sharing program called Bearshare").

[11] *See Lubojasky v. State*, No. 03-10-00780-CR, 2012 WL 5192919, at *16 n.14 (Tex. App.—Austin Oct. 19, 2012, pet. ref'd) (mem. op., not designated for publication) ("LimeWire is peer-to-peer file[-]sharing software that . . . is often used to download images and videos of child pornography.").

[12] Detective Arnold explained that "Vicky is a common series in child pornography that a lot of people that are seeking child pornography want to get.  It [is] a video series . . . [of] a[] 4-year old child[,] whose name is Vicky[,] up to about the age of 11.  There are many, many videos over that time period that were made by her stepfather as he was sexually abusing her."  *See Gasper v. State*, Nos. 01-16-00930-CR, 01-16-00931-CR, 01-16-00932-CR, 2017 WL 4249558, at *4 n.17 (Tex. App.—Houston [1st Dist.] Sept. 26, 2017, no pet.) (mem. op., not designated for publication) ("'Vicki' is 'a series of a child' and a 'common search term[]' for child pornography[.]"); *Hicks v. State*, Nos. 07-12-00256-CR to 07-12-00276-CR, 2013 WL 4711223, at *2 (Tex. App.—Amarillo Aug. 28, 2013, no pet.) (mem. op., not designated for publication) (noting "the 'Vicky' series . . . [is a] series [that is] readily recognized by those who investigate child[-]pornography cases").

[13] Detective Arnold noted that "PTHC is an acronym [that] stands for Pre[-]Teen Hard Core.  It's another common search term that people will use on a file[-]sharing network when looking for child pornography."  *See Gasper*, 2017 WL 4249558, at *3 n.8 ("'PTHC' is a 'common search term[]' for child pornography and stands for 'preteen hard core[.]'").

6

curiosity" and he had searched for "Vicky," "PTHC," and "Baby J"[14] when looking for pornography on file-sharing networks. (Internal quotations omitted.) When appellant had searched for "Vicky" on a file-sharing network, "[a] whole bunch of porn showed up." (Internal quotations omitted.) And when Arnold asked appellant if he had ever searched for a particular age while looking for pornography, appellant stated that he had searched for "12." (Internal quotations omitted). According to Arnold, appellant had downloaded twenty-five child-pornography images and videos over a four-month period from December 2014 until March 2015. Appellant stated that he would download a child-pornography image or video "to see if the children were real" and this would then "lead [him] to the next one." (Internal quotations omitted.) In other words, appellant admitted that he had downloaded, viewed, and continued to search for child pornography.

Appellant also stated in his interview that he had deleted the child pornography that he had found. And he had looked for "adult porn" or pornography involving "adult women." (Internal quotations omitted.) Further, when he had

---

[14] Detective Arnold explained that "Baby J" is a "child porn[ography] series video [involving] a toddler or an infant child, probably 2 to 3 years of age." (Internal quotations omitted.) Detective Cox testified that "Baby J is a common series of child pornography." (Internal quotations omitted). *See Assousa v. State*, No. 05-08-00007-CR, 2009 WL 1416759, at *2 (Tex. App.—Dallas May 21, 2009, pet. ref'd) (mem. op., not designated for publication) ("Baby J series" constituted "known child-porn series[,] involving an infant child." (internal quotations omitted)).

"tr[ied] to download movies," appellant stated that "suddenly porn would [just] come up." (Internal quotations omitted.) Appellant also stated that he had not realized that child pornography had actually been downloaded onto his computer. However, appellant admitted to looking at child pornography from 2011–2014. And at the end of his interview, he affirmed that he had "looked at child porn[ography]," explaining that he was "done looking at it" because he was "no longer curious." (Internal quotations omitted.)

Detective Arnold further testified that law enforcement officers found child pornography on more than one electronic device in appellant's home. In fact, they found over 900 child-pornography images and videos on appellant's electronic devices and discovered that appellant had been viewing and downloading child pornography over "a four-year period." Arnold opined that the large volume of child pornography found on appellant's electronic devices indicated that he had not been accidentally downloading child pornography. One electronic device contained 727 child-pornography images, a second device contained sixteen child-pornography images, and a third device contained 168 child-pornography images.

Detective Arnold explained that appellant had also been "distribut[ing] child pornography," noting that he had shared a child-pornography video with Arnold's computer. Specifically, on March 6, 2015, appellant had a child-pornography video in his "unique share folder" on the "ARES" file-sharing network, Arnold's computer

"connected to [appellant's] share folder[,]" and Arnold "got the video from [appellant]." Arnold did concede that he did not know who specifically was using appellant's computer at the time that the child-pornography video was shared. However, appellant had told Arnold that he lived by himself and "[h]e was the one searching and . . . looking at the[] [child-pornography] videos."

Detective Cox, a computer forensic analyst with the ICACTF, testified that on May 12, 2015, he, along with other law enforcement officers, served a search warrant on appellant at his residence. Cox, as a computer forensic analyst, was responsible, along with Detective Vlasek, for "preview[ing]" or "[t]riag[ing]" any electronic devices found in appellant's home, including "hard drives, laptops, flash drives, [and] camera cards," to determine whether they contained "any evidence of child pornography." "[E]vidence of child pornography" could include file-sharing networks, "child[-]pornography files themselves," and "link files which would show any . . . files that [had been recently] opened on" a particular electronic device.

In regard to the electronic devices found in appellant's home, Detective Cox noted that, while "preview[ing]" or "[t]riag[ing]," he did not find any actual child-pornography files on appellant's devices, but he found "link files" with "titles that were consistent with child[-]pornography files."[15] And Cox found file-sharing

---

[15] *See U.S. v. Brown*, No. 10-20233, 2012 WL 5948085, at *2 (E.D. Mich. Nov. 28, 2012) (order) (in regard to offense of possession of child pornography, noting "the Government presented evidence that someone viewed child pornography on the

9

networks on multiple electronic devices in appellant's home. Although Cox did not find actual child-pornography files while "[t]riag[ing]" appellant's electronic devices, he "found evidence that child porn[ography] had been on some of the devices that [he was] look[ing] at." Cox noted that law enforcement officers seized several electronic devices from appellant's home so that "full forensic[] [analysis could be] done . . . at a later date by a forensic officer."

Detective Vlasek, a former computer forensic analyst with the ICACTF, testified that on May 12, 2015, he, along with other law enforcement officers, served a search warrant on appellant at his residence. Vlasek and Detective Cox were responsible for "preview[ing]" or "triag[ing]" the contents of the electronic devices found in appellant's home. And while "preview[ing]" or "triag[ing]" the devices, he found "link files" and "quite a few" of "peer-to-peer [file-sharing] programs." Vlasek explained that "link files" and "linked to" "[a]nything that [a] user [of an electronic device] has viewed, opened, [or] executed," and based on the titles of the "link files" found on appellant's electronic devices, Vlasek determined that they related to child pornography. Vlasek opined that the file-sharing networks and "link files" "indicat[ed] that child pornography exist[ed]" on appellant's electronic

desktop computer by way of a link file found on the . . . computer hard drive"); *United States v. Koch*, No. 3:08-cr-0105-JAJ, 2009 WL 10697501, at *2–5 (S.D. Iowa July 6, 2009) (order) (considering presence of "[l]ink files relating to child pornography" in determining defendant's guilt).

10

devices. And law enforcement officers seized electronic devices from appellant's home that day.

Following the seizure of appellant's electronic devices, Detective Vlasek completed a forensic analysis and found downloaded child pornography on three electronic devices: (1) a "gray desktop computer," (2) a "Dell desktop" computer, and (3) a "PNY flash drive." In total, he found "[r]oughly 900" child-pornography images and videos on appellant's electronic devices.

In regard to the "gray desktop computer," Detective Vlasek testified that it contained 168 downloaded child-pornography images and twenty-five child-pornography videos.[16] Vlasek viewed the child-pornography images and videos and confirmed that they did indeed constitute child pornography. The majority of the images and videos found on the "gray desktop computer" were "in the thumbnail database," which indicated that they had been viewed.

Detective Vlasek further noted that he had discovered, on the "gray desktop computer," the "ARES" file-sharing network. And he determined that the majority of the child-pornography images and videos found on the "gray desktop computer"

---

[16]     The trial court admitted into evidence State's Exhibit 4, a list of 366 child-pornography images and videos found on the "gray desktop computer." Detective Vlasek explained that some of the child-pornography images and videos appear several times on the list because they had been downloaded several times. State's Exhibit 4 reveals that the child-pornography images and videos found on the "gray desktop computer" had been downloaded in 2008, 2010, and 2011.

11

had been downloaded using that program. According to Vlasek, although the child-pornography images and videos that he recovered from the "gray desktop computer" had been deleted, the "ARES" file-sharing network had not.

Detective Vlasek further explained that he was able to recover the titles of the child-pornography images and videos that had been downloaded on the "gray desktop computer," which included the following: "Six-year-old Larissa Fucked 124s 1," "Ten-year-old LS Magazine Issue LSM,"[17] "PTHV, Lolifuck, 10-year-old Handjob," "W18 Lolitas, Folladas"[18] "Eight-year-old Real Child Porn Pre[-]Teen Pedo PTHD kiddy incest anal cum," and "Kid Sex, . . . PTHC, King Pass, hussyfan, Baby J, Jenny, Baby shiv 2."[19] (Internal quotations omitted.) Vlasek also recovered the "search terms" that had been "inputted" into the "ARES" file-sharing network

---

[17] Detective Arnold testified that "LSM" was "an infamous photography studio in Europe that specialized in child pornography." The studio "would take series of pictures of kids, usually between the ages of 4 years old up to about 15 [years old] in various states of undress." Arnold opined that "if you're actually . . . searching for the letters 'LSM,' you're looking for this European company that filmed children involved in sexual conduct." Detective Cox further explained that "LSM" is "a series of child pornography. *See U.S. v. Laub*, No. 12-40103-01-JAR, 2014 WL 1400669, at *1 & n.2 (D. Kan. Apr. 10, 2014) ("[L]sm" constitutes "a common label or term present in files or documents containing images of child pornography" (internal quotations omitted)).

[18] *See Gasper*, 2017 WL 4249558, at *3 n.9 ("'Lolita' and 'Loli' are 'common search terms' for child pornography.").

[19] *See Solon v. United States*, Nos. 2:11-CV-303-CAB, 07-CR-032-CAB, 2013 WL 12321956, at *14 n.10 (D. Wyo. May 24, 2013) (order) (video title containing "Babyshivid," among other terms, "le[ft] little doubt [that] the content relate[d] to child pornography").

12

on the "gray desktop computer," which included the following: "Baby J," "LSM," "Kiddie,"[20] "Pedo,"[21] "Kinderfuck," "Kiddie Pedo," "King Pass,"[22] "Kiddie Porn," "Kids," "[9]YO,"[23] and "TPSF."[24] (Internal quotations omitted.) When asked whether he found "those search terms . . . [on] computers seized out of [appellant's] home," Vlasek responded, "Yes."

Further, during Detective Vlasek's testimony, the trial court admitted into evidence State's Exhibits 6 and 7, certain child-pornography images and videos that were found on the "gray desktop computer" seized from appellant's home.[25] Vlasek noted that these images and videos were indicative of the other child-pornography images that he found on the other electronic devices seized from appellant's home.

---

[20] *See Lubojasky*, 2012 WL 5192919, at *16 n.14 ("[K]iddie" constitutes "[a] known child pornography search term[]" (internal quotations omitted)).

[21] *See id.* ("PEDO" constitutes "[a] known child pornography search term[]" (internal quotations omitted)); *Brackens v. State*, 312 S.W.3d 831, 834 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd) ("'Pedo' . . . short for pedophile or pedophilia.").

[22] Detective Cox testified that "King Pass" is "a term that [he] find[s] on many child[-]pornography files," and Detective Arnold explained that "King Pass" is a "term that . . . [is] attached in commonly looked-for child[-]pornography videos." (Internal quotations omitted.)

[23] *See Laub*, 2014 WL 1400669, at *1 (filename containing "9 yo" referenced age of child and indicative of child pornography (internal quotations omitted)); *Solon*, 2013 WL 12321956, at *14 n.10 (video title containing "10yo and 9yo lolitas," among other terms, "le[ft] little doubt [that] the content relate[d] to child pornography" (internal quotations omitted)).

[24] The trial court admitted into evidence State's Exhibit 5, a list of the search terms inputted into the "ARES" file-sharing network on the "gray desktop computer."

[25] Detective Vlasek testified that State's Exhibit 7 depicted "[a] little girl," named "Vicky."

13

In regard to the "Dell desktop" computer, Detective Vlasek testified that it contained sixteen "complete[ly] download[ed]" child-pornography images and the "ARES" file-sharing network, all of which had been deleted. Vlasek recovered the titles of certain images that had been downloaded to the "Dell desktop," which included the following: "King Pass," "Old Cousin Fucks Little Cousin, Rare, New divx 2," "PTHC, valya 10-year, 2 Sound," "Babyshivid, Five-year old," "Webcam, 14-year Boy," and "Way Fuck, PTHC, 3-year mom, dad Fuck."[26]   (Internal quotations omitted.)

In regard to the "PNY flash drive," Detective Vlasek explained that it contained 727 downloaded child-pornography images, which had been deleted, and three file-sharing networks, i.e., "ARES," "Limewire," and "Vuze."[27]   Vlasek viewed the 727 child-pornography images to confirm that they indeed constituted child pornography. The only items on the flash drive were child-pornography images.

---

[26]   The trial court also admitted into evidence State's Exhibit 3, a list of nine titles of child-pornography images found on the "Dell computer." State's Exhibit 3 states that these images were downloaded on July 25, 2014.

[27]   *See United States v. Walley*, Nos. 8:13-cr-304-T-23AEP, 8:15-cv-344-T-23AEP, 2018 WL 1519047, at *1 (M.D. Fla. Mar. 28, 2010) (order) (defendant admitted to downloading "a couple hundred child[-]pornograph[y] images and a few videos . . . through Vuze, a peer-to-peer [file-sharing] network" (internal quotations omitted)).

Detective Vlasek conceded that he did not know who had specifically downloaded the child-pornography images and videos that he found on the electronic devices seized from appellant's home. Nor could he testify as to who specifically entered in the "search terms" into the file-sharing networks. Further, every child-pornography image or video that he found on appellant's electronic devices had been "deleted" at some point.

However, Detective Vlasek also explained that there were no other persons in appellant's home when the search warrant was served, he was not aware that anyone else lived in the home with appellant, and appellant was "in possession of" the "gray desktop computer," the "Dell computer," and the "PNY flash drive" when the search warrant was served. Further, Vlasek noted that appellant would have seen the title of any file before he "click[ed] the button to download it." And he opined, based on the filenames, that it would not be surprising that the files would contain child pornography. When Vlasek was asked whether he could "tell . . . that [appellant] had] actually looked at any of th[e] child pornography," Vlasek responded "Yes, actually, I can."[28]

In his audio-recorded interview with Detective Arnold and Agent Lewis, admitted into evidence as State's Exhibit 2, appellant stated that he was the only

---

[28] However, Detective Vlasek noted that he was unable to tell whether the child-pornography image or video had been viewed for "one minute, ten seconds, one second, or an hour."

15

person living in his home[29] and he owned several computers. Specifically, appellant noted that he had a "Dell desktop" computer in the game room/den of his house and a "homemade" desktop computer in his bedroom. He further admitted that he had used certain file-sharing networks, including "Limewire," "ARES," and "BearShare." And he had primarily used the "ARES" file-sharing network on the "Dell desktop" computer. Appellant conceded that he had "come across" child pornography, while using the "ARES" file-sharing network, noting that "sometimes, a whole bunch of stuff [would] just pop[] up" when he would generally search for "porn." Appellant admitted that he would actually see the titles of the files prior to downloading them from the file-sharing network, and he would have to "click" on a particular image or video in order to download it. Appellant stated that when he saw a child-pornography file on the "ARES" file-sharing network, he would delete it.[30]

Further, during the interview, when Detective Arnold told appellant that he had a child-pornography video in his share folder on the "ARES" file-sharing network, appellant stated that it would have been "caught up in some other stuff" that he had downloaded. And although appellant stated that he would "delete" any child-pornography that appeared on the "ARES" file-sharing network, he also stated

---

[29]    Appellant noted that his two sons had previously lived with him, but they were now married and living elsewhere. One son lives in Florida.

[30]    Appellant stated that he used the "ARES" file-sharing network between December 2014 and March 2015.

16

that he would delete it after he had "seen . . . what it was." Further, appellant admitted to "looking" for child pornography because he was curious about it. And he confirmed that he had searched for "porn," "PTHC," "Vicky," and the age of "12." According to appellant, when he had searched for "Vicky," "a whole bunch of" pornography involving "younger girls" appeared. And he searched for the age of "12" to see if there was pornography involving "underage girls."

Appellant also stated that "a lot" of the files that he saw said "young women," which he thought meant women who were nineteen or twenty years old. But, he also recalled seeing child-pornography images or videos involving ten-year-old and twelve-year-old children, and he wondered if they were real. This curiosity led appellant to look at more child-pornography images and videos because he was "wonder[ing]." When Arnold asked appellant if he had a "curiosity" for child pornography in 2011, 2012, 2013, and 2014, appellant responded, "I guess so, just every once in a while." According to appellant, he would look at child pornography and then stop. Appellant stated that he had used several different computers at different times, and he did not know whether law enforcement officers would find evidence of child pornography before 2011. According to appellant, he had "satisfied" his curiosity related to child pornography.[31]

---

[31] At the end of the interview, Detective Arnold told appellant that he could go back inside of his house, sit downstairs, "relax," and "hang out" while law enforcement officers finished looking at his electronic devices. Arnold also told appellant that

**Sufficiency of Evidence**

In his second issue, appellant argues that the evidence is legally insufficient to support his convictions because the State did not prove that he intentionally and knowingly possessed child pornography.

We review the legal sufficiency of the evidence by considering all of the evidence in the light most favorable to the jury's verdict to determine whether any "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S. Ct. 2781, 2788–89 (1979); *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). Our role is that of a due process safeguard, ensuring only the rationality of the trier of fact's finding of the essential elements of the offense beyond a reasonable doubt. *See Moreno v. State*, 755 S.W.2d 866, 867 (Tex. Crim. App. 1988). We give deference to the responsibility of the fact finder to fairly resolve conflicts in testimony, weigh evidence, and draw reasonable inferences from the facts. *Williams*, 235 S.W.3d at 750. However, our duty requires us to "ensure that the evidence presented actually supports a conclusion that the defendant committed" the criminal offense of which he is accused. *Id.*

---

officers would likely take some of his electronic devices "back [to] the station" so that appellant did not have to "spend the entire day" with officers in his home. Appellant was permitted to watch television while the officers were in his home. He was not arrested on May 12, 2015, and the officers left his home at the conclusion of their search.

We note that in reviewing the legal sufficiency of the evidence, a court must consider both direct and circumstantial evidence, as well as any reasonable inferences that may be drawn from the evidence. *See Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007); *see also Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012) (evidence-sufficiency standard of review same for both direct and circumstantial evidence). Circumstantial evidence is just as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt. *Clayton*, 235 S.W.3d at 778; *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). For evidence to be sufficient, the State need not disprove all reasonable alternative hypotheses that are inconsistent with a defendant's guilt. *See Wise*, 364 S.W.3d at 903; *Cantu v. State*, 395 S.W.3d 202, 207–08 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd). Rather, a court considers only whether the inferences necessary to establish guilt are reasonable based upon the cumulative force of all the evidence when considered in the light most favorable to the jury's verdict. *Wise*, 364 S.W.3d at 903; *Hooper*, 214 S.W.3d at 13.

Appellant argues that the State did not prove that he intentionally and knowingly possessed child pornography because the "ARES peer-to-peer [file-sharing] network" that he used "automatically download[ed] files to a shared folder that other users of ARES could access" and "most users are not even aware that the files are being shared from their computers"; he did not "possess[] . . . any

19

specialized software to recover deleted files"; "it is . . . possible for a person who believes that he is viewing only adult pornography to inadvertently download child pornography" or to be "redirected to a child pornography site without his knowledge"; "there is no evidence . . . that . . . he was indeed the person who accessed the [i]nternet files, knew that the[] files were being automatically downloaded and saved to his hard drive"; the search of his home did not reveal any "sexually explicit materials . . . depicting children"; and there is no evidence that he "had [ever] corresponded or met with another person to share information and identities of their victims," "maintained or ran his own photographic production and reproduction equipment," rented or used a "safe deposit box[] or other storage facility[y]," "collected, read, copied or maintained . . . lists of persons [with] similar sexual interests," "kept the names of any children he may have been involved with," "maintained diaries of any sexual encounters with children," "cut pictures of any children out of any . . . publications . . . [to] use as a means of fantasy relationships," "collected . . . writings on the subject of sexual activities with any children" or "on the subject of sexual activity," "used sexual aids . . . in the seduction of any victims," "used any drugs or alcohol as a means of inducement to get any child to a particular location," "maintained artifacts . . . which depicted any children . . . in nude poses or sexual acts," "kept mementoes," "maintained any World Wide Web site," or "used many screen names." Further, appellant asserts that "[t]he fact that every

20

single file depicting child pornography [that was found on appellant's electronic devices] had been deleted . . . evidences a lack of intent."

A person commits the offense of possession of child pornography if he knowingly or intentionally possesses visual material that visually depicts a child, younger than eighteen years of age at the time the image of the child was made, who is engaging in sexual conduct, and the person knows that the material depicts the child in this manner. TEX. PENAL CODE ANN. § 43.26(a) (Vernon 2016); *Wise*, 364 S.W.3d at 903; *Krause v. State*, 243 S.W.3d 95, 110 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd). A person acts "intentionally" or with intent "with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result." TEX. PENAL CODE ANN. § 6.03(a) (Vernon 2011). A person acts "knowingly" or with knowledge of the nature of his conduct or circumstances "when he is aware of the nature of his conduct or that the circumstances exist." *Id.* § 6.03(b).

"Possession" means "actual care, custody, control, or management." *Id.* § 1.07(a)(39) (Vernon Supp. 2018) (internal quotations omitted). A defendant commits a possession offense only if he voluntarily possesses the contraband. *Id.* § 6.01(a) (Vernon 2011). Possession is voluntary "if the possessor knowingly obtains or receives the [contraband] possessed or is aware of his control of the [contraband] for a sufficient time to permit him to terminate his control." *Id.*

21

§ 6.01(b); *see also Williams v. State*, 313 S.W.3d 393, 397 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd).  Proof of a culpable mental state almost invariably depends on circumstantial evidence, and a trier of fact can infer knowledge from all the circumstances, including the acts, conduct, and remarks of the accused.  *See Hernandez v. State*, 819 S.W.2d 806, 810 (Tex. Crim. App. 1991); *Dillon v. State*, 574 S.W.2d 92, 94–95 (Tex. Crim. App. 1978).

If contraband is not found on a person or is not in a location that is under the exclusive control of a single person, mere presence at the location where the contraband is found is insufficient by itself to establish actual care, custody, or control of the contraband.  *See Evans v. State*, 202 S.W.3d 158, 162 (Tex. Crim. App. 2006).  "However, presence or proximity, when combined with other evidence, either direct or circumstantial . . . , may well be sufficient to establish [possession] beyond a reasonable doubt."  *Id.*  Accordingly, a fact finder may infer that a defendant intentionally or knowingly possessed contraband not in his exclusive possession if there are sufficient independent facts and circumstances justifying such an inference.  *Tate v. State*, 500 S.W.3d 410, 413–14 (Tex. Crim. App. 2016).  In other words, evidence that links the defendant to the contraband suffices for proof that he possessed it knowingly.  *Brown v. State*, 911 S.W.2d 744, 747 (Tex. Crim. App. 1995); *Wilson v. State*, 419 S.W.3d 582, 587–88 (Tex. App.—San Antonio 2013, no pet.).  It is not the number of links that is important, but rather the logical

force the links have in establishing the elements of the offense. *Evans*, 202 S.W.3d at 162.

In *Wise*, the Texas Court of Criminal Appeals noted the "peculiarities of determining knowing or intentional possession of computer pornography" and concluded that "each case must be analyzed on its own facts." 364 S.W.3d at 904–05. Thus, the court held that in computer-pornography cases, "like all criminal cases, a court must assess whether the inferences necessary to establish guilt are reasonable based upon the cumulative force of all the evidence considered in the light most favorable to the verdict." *Id.* at 905.

Sufficient evidence to support a jury's determination that a defendant had knowledge of child pornography on his electronic devices may include evidence: (1) the child pornography was found in different computer files, showing that the images or videos had been copied or moved; (2) the child pornography was found on an external hard drive or a removable storage device, which would indicate that the images or videos were deliberately saved on the external device; (3) the child-pornography stored on the computer and the external hard drive were stored in similarly named folders; (4) the names of the folders containing child pornography necessarily were assigned by the person saving the files; or (5) numerous images or videos of child pornography were recovered from the defendant's electronic devices. *See Ballard v. State*, 537 S.W.3d 517, 523 (Tex. App.—Houston [1st Dist.] 2017,

23

no pet.); *Krause*, 243 S.W.3d at 111–12; *see also Savage v. State*, Nos. 05-06-00174-CR, 05-06-00175-CR, 2008 WL 726229, at \*5 (Tex. App.—Dallas Mar. 19, 2008, pet. ref'd) (not designated for publication).

Detective Arnold testified on March 6, 2015, his computer, which "monitor[ed] file[-]sharing networks for the transmission of child pornography," "made a direct connection and download[ed]" a child-pornography video "from an IP address in Pearland, [Texas]." Based on the IP address, Arnold determined that the downloaded child-pornography video had originated from appellant's residence, which had a secure internet connection.

On May 12, 2015, Detective Arnold and other members of the ICACTF searched appellant's home for evidence of child pornography. There, law enforcement officers found child pornography on more than one electronic device. In fact, they found over 900 child-pornography images and videos on appellant's electronic devices. And forensic analysis of the devices showed that appellant had been viewing and downloading child pornography over "a four-year period." According to Arnold, one electronic device found in appellant's home contained 727 child-pornography images, a second electronic device contained sixteen child-pornography images, and a third electronic device contained 168 child-pornography images. *See Ballard*, 537 S.W.3d at 523–24 (evidence sufficient where electronic devices seized from defendant's residence contained "several

24

hundred [child-pornography] videos"); *Savage*, 2008 WL 726229, at *7 (evidence sufficient where "numerous images of child pornography were recovered from [defendant's] computer"); *Krause*, 243 S.W.3d at 111–12 (evidence sufficient where defendant owned "CD's, computers, and hard drives that stored images of children engaged in sexual conduct"). Arnold opined that the large volume of child pornography on appellant's electronic devices indicated that he had not accidentally downloaded child pornography. *See Gasper v. State*, Nos. 01-16-00930-CR, 01-16-00931-CR, 01-16-00932-CR, 2017 WL 4249558, at *7 (Tex. App.—Houston [1st Dist.] Sept. 26, 2017 no pet.) (mem. op., not designated for publication) (evidence sufficient where law enforcement officer opined defendant had not accidentally downloaded child pornography).

Detective Arnold explained that appellant had also been "distribut[ing] child pornography," noting that he had actually shared a child-pornography video with Arnold's computer. Specifically, on March 6, 2015, appellant had a child-pornography video in his "unique share folder" on the "ARES" file-sharing network, Arnold's computer "connected to [appellant's] share folder[,]" and Arnold "got the video from [appellant]." Although Arnold did not know who specifically was using appellant's computer at the time that the child-pornography video was shared with Arnold's computer, appellant had told Arnold that he lived by himself and "[h]e was the one searching and . . . looking at the[] [child-pornography]

25

videos." *See Gasper*, 2017 WL 4249558, at *7 (evidence sufficient where electronic devices found in home owned by defendant and he owned and used devices); *Ballard*, 537 S.W.3d at 523–24 (evidence sufficient where defendant "primary user" of computer).

Further, during his interview Detective Arnold and Agent Lewis, appellant stated that he had downloaded and used certain file-sharing networks, including "ARES,"[32] "BearShare and Bear,"[33] and "Limewire,"[34] on the electronic devices in his home.[35] *See Gasper*, 2017 WL 4249558, at *7 (evidence sufficient where defendant admitted to using peer-to-peer file-sharing network "that c[ould] be used to obtain child pornography"); *Lubojasky v. State*, No. 03-10-00780-CR, 2012 WL 5192919, at *16 n.14 (Tex. App.—Austin Oct. 19, 2012, pet. ref'd) (mem. op., not designated for publication) (peer-to-peer file-sharing network "often used to download images and videos of child pornography"). And when Arnold questioned appellant about certain terms that he may have searched for on a file-sharing

---

[32] *See Ferguson*, 2016 WL 4247956, at *1. Appellant admitted to using "ARES" in 2015.

[33] *See Wiand*, 2012 WL 1033623, at *1.

[34] *See Lubojasky* 2012 WL 5192919, at *16 n.14.

[35] Detective Arnold explained that a file-sharing network "doesn't do anything on its own." A person "ha[s] to tell it what [to] look[] for," "ha[s] to tell it to download files," and "ha[s] to manually open files and view them." And a file-sharing network does not appear on a person's computer unless he specifically "download[s] it."

network, including "Vicky"[36] and "PTHC,"[37] appellant admitted that he had in fact viewed child pornography "out of curiosity" and he had searched for "Vicky," "PTHC," and "Baby J."[38]  *See Gasper*, 2017 WL 4249558, at *11 (evidence sufficient where defendant "admitted to seeing certain child-pornography terms while searching for pornography, and he knew the meaning of the[] terms"); *see also Wenger v. State*, 292 S.W.3d 191, 200–01 (Tex. App.—Fort Worth 2009, no pet.) (evidence sufficient to support defendant intentionally or knowingly disseminated child pornography where he admitted to searching by inputting search terms like "young" and "Lolita" (internal quotations omitted)).  According to appellant, searching for "Vicky" on a file-sharing network prompted "[a] whole bunch of porn [to] show[] up."  (Internal quotations omitted.)  And when Arnold asked appellant

---

[36]  Detective Arnold explained that "Vicky is a common series in child pornography that a lot of people that are seeking child pornography want to get.  It [is] a video series . . . [of] a[] 4-year old child[,] whose name is Vicky[,] up to about the age of 11.  There are many, many videos over that time period that were made by her stepfather as he was sexually abusing her."  *See Gasper*, 2017 WL 4249558, at *4 n.17; *Hicks*, 2013 WL 4711223, at *2.

[37]  Detective Arnold noted that "PTHC is an acronym [that] stands for Pre[-]Teen Hard Core.  It's another common search term that people will use on a file[-]sharing network when looking for child pornography."  *See Gasper*, 2017 WL 4249558, at *3 n.8.

[38]  Detective Arnold explained that "Baby J" is a "child porn[ography] series video [involving] a toddler or an infant child, probably 2 to 3 years of age."  (Internal quotations omitted.)  Detective Cox testified that "Baby J is a common series of child pornography."  (Internal quotations omitted).  *See Assousa*, 2009 WL 1416759, at *2.

27

whether he had ever searched for a particular age when looking for pornography, appellant stated that he had searched for "12." (Internal quotations omitted).

Further, appellant told Detective Arnold that he would download a child-pornography image or video "to see if the children were real" and this would then "lead [him] to the next one." (Internal quotations omitted.) In other words, appellant admitted that he had downloaded, viewed, and continued to search for child pornography. Appellant further admitted that he had looked at child pornography from 2011–2014. And at the end of his interview, appellant affirmed that he had "looked at child porn[ography]," explaining that he was "done looking at it" because he was "no longer curious." (Internal quotations omitted.) *See Gasper*, 2017 WL 4249558, at *11 (evidence sufficient where defendant admitted to "'open[ing]' files containing child pornography and 'look[ing] at' them" (alterations in original)); *Wilson*, 419 S.W.3d at 590 (evidence sufficient where defendant, in his interview, stated he "inadvertently viewed [child-pornography] images and would quickly 'back out,'" "just clicked on [certain] images to 'verify' that they were of underage children," "viewed images he knew were of underage children because he was 'curious,'" and "looked at [child-pornography] images out of sympathy for the children"); *Bethards v. State*, No. 10-09-00016-CR, 2011 WL 2937875, at *6 (Tex. App.—Waco July 20, 2011, no pet.) (mem. op., not designated for publication) (evidence sufficient where defendant admitted to "intentionally

28

search[ing] for child pornography . . . because he was curious and was looking for information on whether the websites were legal").

Detective Vlasek, a former computer forensic analyst with the ICACTF, testified that on May 12, 2015, he, while "preview[ing]" or "triag[ing]" the contents of the electronic devices found in appellant's home, found "link files" and "quite a few" of "peer-to-peer [file-sharing] programs." *See Gasper*, 2017 WL 4249558, at *8–9 (evidence sufficient where forensic analysis of electronic devices revealed peer-to-peer file-sharing network and child-pornography images and videos); *Lubojasky*, 2012 WL 5192919, at *16 n.14 (peer-to-peer file-sharing network "often used to download images and videos of child pornography"). Vlasek explained that "link files" are "linked to" "[a]nything that the user [of the electronic device] has viewed, opened, [or] executed," and based on the titles of the "link files," Vlasek was able to determine that they related to child pornography.[39] Vlasek opined that the file-sharing networks and "link files" found on appellant's electronic devices "indicat[ed] that child pornography exist[ed]."

Detective Vlasek completed a full forensic analysis of the electronic devices seized from appellant's home, and he found downloaded child pornography on three devices: (1) a "gray desktop computer," (2) a "Dell desktop" computer, and (3) a "PNY flash drive." In total, he found "[r]oughly 900" child-pornography images

---

[39]    *See Brown*, 2012 WL 5948085, at *2; *Koch*, 2009 WL 10697501, at *2–5.

and videos on appellant's electronic devices. *See Gasper*, 2017 WL 4249558, at *8–10 (evidence sufficient to establish defendant intentionally or knowingly possessed child pornography where full forensic analysis revealed large amount of child pornography on electronic devices seized from defendant's home); *Ballard*, 537 S.W.3d at 523–24 (evidence sufficient where electronic devices seized from defendant's residence contained "several hundred [child-pornography] videos"); *Krause*, 243 S.W.3d at 111–12 (evidence sufficient where defendant owned "CD's, computers, and hard drives that stored images of children engaged in sexual conduct"); *see also Bogany v. State*, Nos. 14-10-00138-CR to 14-10-00146-CR, 2011 WL 704359, at *4–6 (Tex. App.—Houston [14th Dist.] Mar. 1, 2011, pet. ref'd) (mem. op., not designated for publication) (size of child-pornography collection on defendant's computer "large enough to be obvious to the owner of the computer").

In regard to the "gray desktop computer," Detective Vlasek testified that it contained 168 downloaded child-pornography images and twenty-five child-pornography videos.[40] *See Ballard*, 537 S.W.3d at 523–24 ("[T]he fact that

---

[40] State's Exhibit 4, admitted into evidence, constituted a list of 366 child-pornography images and videos found on the "gray desktop computer." Detective Vlasek explained that some of the images and videos appear several times on the list because they had been downloaded several times. State's Exhibit 4 reveals that the child-pornography images and videos found on the "gray desktop computer" had been downloaded in 2008, 2010, and 2011.

hundreds of files of child pornography were recovered from [defendant's] computer is . . . circumstantial evidence that he knowingly possessed child pornography."); *Savage*, 2008 WL 726229, at *7 (evidence sufficient where "numerous images of child pornography were recovered from [defendant's] computer"); *see also Bogany*, 2011 WL 704359, at *4–6 (size of child-pornography collection on defendant's computer "large enough to be obvious to the owner of the computer"). Vlasek viewed the child-pornography images and videos found on the "gray desktop computer" and confirmed that they did indeed constituted child pornography. And he explained that the majority of the images and videos found on the "gray desktop computer" were "in the thumbnail database," indicating that the image or video had been viewed.

Detective Vlasek further noted that he had discovered, on the "gray desktop computer," the "ARES" file-sharing network. And he determined that the majority of the child-pornography images and videos found on the "gray desktop computer" had been downloaded using that program. *See Zaratti v. State*, No. 01-04-01019-CR, 2006 WL 2506899, at *6 (Tex. App.—Houston [1st Dist.] Aug. 31, 2006, pet. ref'd) (mem. op., not designated for publication) (evidence sufficient where computer expert located several child-pornography files in peer-to-peer file-sharing database). According to Vlasek, the child-pornography images and videos that he recovered from the "gray desktop computer" had been deleted, but the

31

"ARES" file-sharing network had not. *See Gasper*, 2017 WL 4249558, at \*7, \*9–11 (evidence sufficient although defendant had deleted or attempted to delete child-pornography files); *Assousa v. State*, No. 05-08-00007-CR, 2009 WL 1416759, at \*4 (Tex. App.—Dallas May 21, 2009, pet. ref'd) (not designated for publication) ("Logically, one cannot destroy what one does not possess and control. Indeed, the ability to destroy is definitive evidence of control." (internal quotations omitted)); *Fridell v. State*, Nos. 09-04-200 CR, 09-04-201 CR, 2004 WL 2955227, at \*3 (Tex. App.—Beaumont Dec. 22, 2004, pet. ref'd) (mem. op., not designated for publication) ("[A]ttempts to erase [child-pornography] material from the computer . . . show[s] that [defendant's] possession of child pornography was knowing or intentional.").

Detective Vlasek further explained that he was able to recover the titles of the child-pornography images and videos that had been downloaded on the "gray desktop computer," which included the following: "Six-year-old Larissa Fucked 124s 1," "Ten-year-old LS Magazine Issue LSM,"[41] "PTHV, Lolifuck, 10-year-old

---

[41] Detective Arnold testified that "LSM" was "an infamous photography studio in Europe that specialized in child pornography." The studio "would take series of pictures of kids, usually between the ages of 4 years old up to about 15 [years old] in various states of undress." Arnold opined that "if you're actually . . . searching for the letters 'LSM,' you're looking for this European company that filmed children involved in sexual conduct." Detective Cox further explained that "LSM" is "a series of child pornography. *See Laub*, 2014 WL 1400669, at \*1 & n.2.

Handjob," "W18 Lolitas, Folladas,"[42] "Eight-year-old Real Child Porn Pre[-]Teen Pedo PTHD kiddy incest anal cum," and "Kid Sex, . . . PTHC, King Pass, hussyfan, Baby J, Jenny, Baby shiv 2."[43]  (Internal quotations omitted.)  *See Ballard*, 537 S.W.3d at 523–24 ("explicit titles" of child-pornography files found on defendant's computer suggested knowing possession of child pornography); *Wenger*, 292 S.W.3d at 201 (noting "explicitly descriptive names of the . . . files themselves" in determining sufficiency of evidence).  Vlasek also recovered the "search terms" that had been "inputted" into the "ARES" file-sharing network on the "gray desktop computer," which included the following:  "Baby J," "LSM," "Kiddie,"[44] "Pedo,"[45] "Kinderfuck," "Kiddie Pedo," "King Pass,"[46] "Kiddie Porn," "Kids," "[9]YO,"[47] and "TPSF."[48]  (Internal quotations omitted.)  When asked whether he found "those search terms . . . [on] computers seized out of [appellant's] home," Vlasek

---

[42]    *See Gasper*, 2017 WL 4249558, at *3 n.9.

[43]    *See Solon*, 2013 WL 12321956, at *14 n.10.

[44]    *See Lubojasky*, 2012 WL 5192919, at *16 n.14.

[45]    *See id.*; *Brackens*, 312 S.W.3d at 834.

[46]    Detective Cox testified that "King Pass" is "a term that [he] find[s] on many child[-]pornography files," and Detective Arnold explained that "King Pass" is a "term that . . . [is] attached in commonly looked-for child[-]pornography videos." (Internal quotations omitted.)

[47]    *See Laub*, 2014 WL 1400669, at *1; *Solon*, 2013 WL 12321956, at *14 n.10.

[48]    State's Exhibit 5, admitted into evidence, constituted a list of the search terms inputted into the "ARES" file-sharing network on the "gray desktop computer."

responded, "Yes." And he noted that appellant would have seen the title of any file before he would have "click[ed] the button to download it."

Further, during Detective Vlasek's testimony, the trial court admitted into evidence State's Exhibits 6 and 7, certain child-pornography images and videos that were found on the "gray desktop computer" seized from appellant's home.[49] Vlasek noted that these images and videos were indicative of the other child-pornography images that he found on the other electronic devices seized from appellant's home.

In regard to the "Dell desktop" computer, Detective Vlasek testified that it contained sixteen "complete[ly] download[ed]" child-pornography images and the "ARES" file-sharing network. *See Gasper*, 2017 WL 4249558, at *8–9; *Lubojasky*, 2012 WL 5192919, at *16 n.14; *Savage*, 2008 WL 726229, at *7; *Krause*, 243 S.W.3d at 111–12.

However, the sixteen child-pornography images and the file-sharing network recovered from the "Dell desktop" had been deleted. *See Gasper*, 2017 WL 4249558, at *7, *9–11; *Assousa*, 2009 WL 1416759, at *4; *see also Fridell*, 2004 WL 2955227, at *3. Vlasek explained that he was able to recover titles of certain images that had been downloaded to the "Dell desktop," which included the following: "King Pass," "Old Cousin Fucks Little Cousin, Rare, New divx 2,"

---

[49] According to Detective Vlasek, State's Exhibit 7 depicted "[a] little girl" named "Vicky."

34

"PTHC, valya 10-year, 2 Sound," "Babyshivid, Five-year old," "Webcam, 14-year Boy," and "Way Fuck, PTHC, 3-year mom, dad Fuck."[50]  (Internal quotations omitted.)  *See Ballard*, 537 S.W.3d at 523–24 ("explicit titles" of child-pornography files found on defendant's computer suggested knowing possession of child pornography); *Wenger*, 292 S.W.3d at 201 (noting "explicitly descriptive names of the . . . files themselves" in determining sufficiency of evidence).

In regard to the "PNY flash drive," Detective Vlasek testified that it contained 727 downloaded child-pornography images, which had been deleted, and three file-sharing networks, i.e., "ARES," "Limewire," and "Vuze."[51]  *See Gasper*, 2017 WL 4249558, at *7, *9–11; *Assousa*, 2009 WL 1416759, at *4; *Fridell*, 2004 WL 2955227, at *3; *see also Lubojasky*, 2012 WL 5192919, at *16 n.14.  Vlasek viewed the 727 child-pornography images to confirm that they indeed constituted child pornography. *See Gasper*, 2017 WL 4249558, at *8–9; *Savage*, 2008 WL 726229, at *7; *see also Bogany*, 2011 WL 704359, at *4–6 (size of child-pornography collection on defendant's computer "large enough to be obvious to the owner of the computer").  The only items on the flash drive were child-pornography images.  *See*

---

[50]   State's Exhibit 3, admitted into evidence, constituted a list of nine titles of child-pornography images found on the "Dell computer."  State's Exhibit 3 states that these images were downloaded on July 25, 2014.  Detective Vlasek noted that appellant would have seen the title of a file before "click[ing] the button to download it."

[51]   *See Walley*, 2018 WL 1519047, at *1.

*Ballard*, 537 S.W.3d at 524 ("[E]vidence supports an inference that [defendant] possessed child pornography knowingly because it . . . [was] saved deliberately to the[] external devices."); *Savage*, 2008 WL 726229, at \*6 (child-pornography images found on "loose hard drive" and "zip disks," indicating "deliberately saved on the external devices"); *Krause*, 243 S.W.3d at 111–12 (child pornography found on external hard drive, indicating images "deliberately saved to the[] external device[]").

Although Detective Vlasek conceded that he did not know who had specifically downloaded the child-pornography images and videos that he found on the electronic devices seized from appellant's home or who had entered in the "search terms" into the file-sharing networks, he explained that there were no other persons in appellant's home when the search warrant was served, he was not aware that anyone else lived in the home with appellant, and appellant was "in possession of" the "gray desktop computer," the "Dell computer," and the "PNY flash drive" when the search warrant was served.

In his audio-recorded interview with Detective Arnold and Agent Lewis, appellant stated that he was the only person living in his home and he had a "Dell desktop" computer in the game room/den of his house and a "homemade" desktop computer in his bedroom. He admitted that he had used certain file-sharing networks, including "Limewire," "ARES", and "BearShare." And he had primarily

36

used the "ARES" file-sharing network on the "Dell desktop" computer. *See Gasper*, 2017 WL 4249558, at *7 (evidence sufficient where defendant admitted to using a peer-to-peer file-sharing network "that c[ould] be used to obtain child pornography"); *Lubojasky*, 2012 WL 5192919, at *16 n.14. Appellant stated that he had "come across" child pornography, while using the "ARES" file-sharing network, noting that "sometimes, a whole bunch of stuff [would] just pop[] up" when he would generally search for "porn."[52] *See Gasper*, 2017 WL 4249558, at *11 (evidence sufficient where defendant stated "it was 'possible' that by downloading pornography in 'mega pack[s]' or 'movie pack[s],' he had 'picked up child pornography'" (alterations in original)); *Wilson*, 419 S.W.3d at 590 (evidence sufficient where defendant, in his interview, stated he "inadvertently viewed [child-pornography] images"); *Zaratti*, 2006 WL 2506899, at *5–6 (evidence sufficient even though defendant argued because "his computer contained considerably more files of legal adult pornography than unlawful child pornography, it was possible that he could have downloaded the child pornography unintentionally"). Appellant admitted that he would actually see the titles of the files prior to downloading them from the file-sharing network, and he would have to "click" on a particular image or video in order to download it. Appellant stated that

---

[52]     Appellant conceded that he had used the "ARES" file-sharing network between December 2014 and March 2015.

37

when he saw a child-pornography file on the "ARES" file-sharing network, he would delete it. *See Gasper*, 2017 WL 4249558, at *7, *9–11; *Assousa*, 2009 WL 1416759, at *4; *Fridell*, 2004 WL 2955227, at *3.

Further, during appellant's interview, Detective Arnold told him that he had a child-pornography video in his share folder on the "ARES" file-sharing network, and appellant stated that it would have been "caught up in some other stuff" that he had downloaded. *See Gasper*, 2017 WL 4249558, at *11; *Wilson*, 419 S.W.3d at 590; *Zaratti*, 2006 WL 2506899, at *5–6. Although appellant stated that he would "delete" the child-pornography that appeared on the "ARES" file-sharing network, he also stated that he would delete it after he had "seen . . . what it was." Further, appellant admitted to "looking" for child pornography because he was curious about it. *See Gasper*, 2017 WL 4249558, at *11 (evidence sufficient where defendant admitting to "'open[ing]' files containing child pornography and 'look[ing] at' them" (alterations in original)); *Wilson*, 419 S.W.3d at 590 (evidence sufficient where defendant, in his interview, stated he "inadvertently viewed [child pornography] images and would quickly 'back out,'" "just clicked on [certain] images to 'verify' that they were of underage children," "viewed images he knew were of underage children because he was 'curious,'" and "looked at [child pornography] images out of sympathy for the children"); *Bethards*, 2011 WL 2937875, at *6 (evidence sufficient where defendant admitted to "intentionally

38

search[ing] for child pornography . . . because he was curious and was looking for information on whether the websites were legal"). And he confirmed that he had searched for "porn," "PTHC," "Vicky," and the age of "12." According to appellant, when he searched for "Vicky," "a whole bunch of" pornography involving "younger girls" appeared. And he searched for the age of "12" to see if there was pornography involving "underage girls." *See Gasper*, 2017 WL 4249558, at \*11 (evidence sufficient where defendant "admitted to seeing certain child-pornography terms while searching for pornography, and he knew the meaning of the[] terms"); *see also Wenger*, 292 S.W.3d at 200–01 (evidence sufficient to support defendant intentionally or knowingly disseminated child pornography where he admitted to searching by inputting search terms like "young" and "Lolita" (internal quotations omitted)). Appellant also stated that "a lot" of the files that he saw said "young women," which he thought meant women who were nineteen or twenty years old. But, he recalled seeing child-pornography images or videos involving ten-year-old and twelve-year-old children, and he wondered if they were real. This curiosity led appellant to look at more child-pornography images and videos because he was "wonder[ing]."

Further, when Detective Arnold asked appellant if he had a "curiosity" for child pornography in 2011, 2012, 2013, and 2014, appellant responded, "I guess so, just every once in a while." Appellant explained that he would look at child

39

pornography and then stop, and he had used several different computers at different times. According to appellant, he had "satisfied" his curiosity related to child pornography.

To the extent that appellant asserts that a person other than himself could have been responsible for downloading the child-pornography images and videos found on the electronic devices seized from his home, we note that the State need not disprove all reasonable alternative hypotheses that are inconsistent with appellant's guilt. *See Gasper*, 2017 WL 4249558, at \*11; *Wise*, 364 S.W.3d at 903; *Ballard*, 537 S.W.3d at 522, 524. Further, to the extent that appellant, at times, in his interview with Detective Arnold and Agent Erickson, may have denied downloading child pornography, it was for the jury to determine his credibility and the weight to be given such evidence. *See Adames v. State*, 353 S.W.3d 854, 860 (Tex. Crim. App. 2011); *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010). And appellant's assertion that "[t]he fact that every single file depicting child pornography [that was found on appellant's electronic devices] had been deleted . . . evidences a lack of intent," is simply incorrect. *See Gasper*, 2017 WL 4249558, at \*7, \*9–11; *Assousa*, 2009 WL 1416759, at \*4; *Fridell*, 2004 WL 2955227, at \*3.

Viewing all of the evidence and inferences in the light most favorable to the jury's verdict, we conclude that the evidence is sufficient for a rational fact finder to

have found beyond a reasonable doubt that appellant knowingly or intentionally had care, custody, control, or management of the child pornography found on the electronic devices seized from his house. Accordingly, we hold that the evidence is legally sufficient to support appellant's convictions.

We overrule appellant's second issue.

**Suppression of Statement**

In his first issue, appellant argues that the trial court erred in denying his motion to suppress State's Exhibit 2, his audio-recorded interview with Detective Arnold and Agent Lewis, because "a reasonable and prudent person would [have] believe[d]" that he was "under arrest" at the time of his interview and his "[s]tatements [w]ere the [r]esult of [i]nterrogation."

We review a trial court's denial of a motion to suppress evidence under a bifurcated standard of review. *Turrubiate v. State*, 399 S.W.3d 147, 150 (Tex. Crim. App. 2013). We review the trial court's factual findings for an abuse of discretion and the trial court's application of the law to the facts de novo. *Id.* The trial court is the sole and exclusive trier of fact and judge of the witnesses' credibility and may choose to believe or disbelieve all or any part of the witnesses' testimony. *Maxwell v. State*, 73 S.W.3d 278, 281 (Tex. Crim. App. 2002); *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000). If, as in this case, the trial court makes express findings of fact, we review the evidence in the light most favorable to the trial court's ruling

41

and determine whether the evidence supports the fact findings. *See Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010). A trial court's findings on a motion to suppress may be written or oral. *See State v. Cullen*, 195 S.W.3d 696, 699 (Tex. Crim. App. 2006); *State v. Groves*, 837 S.W.2d 103, 105 n.5 (Tex. Crim. App. 1992). We give almost total deference to the trial court's determination of historical facts, particularly when the trial court's fact findings are based on an evaluation of credibility and demeanor. *Valtierra*, 310 S.W.3d at 447.

We review the trial court's legal ruling de novo unless its explicit findings that are supported by the record are also dispositive of the legal ruling. *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006). We will sustain the trial court's ruling if it is reasonably supported by the record and is correct on any theory of law applicable to the case. *Valtierra*, 310 S.W.3d at 447–48. In determining whether the trial court's ruling on a motion to suppress is supported by the record, we generally consider only the evidence adduced at the hearing on the motion unless the suppression issues have been consensually relitigated by the parties during the trial on the merits. *Rachal v. State*, 917 S.W.2d 799, 809 (Tex. Crim. App. 1996).

Prior to trial, appellant moved to suppress "[a]ny statements . . . allegedly made by [him]" or "[a]ny video and/or audio recordings made of [him]" "[a]t the time of any conversations between [him] and law enforcement officers," i.e., appellant's audio-recorded interview with Detective Arnold and Agent Lewis.

Following a suppression hearing, the trial court denied appellant's motion, and, orally, on the record, issued the following findings of fact and conclusions of law[53]:

> Under Article 38.22 of the Texas Code of Criminal Procedure, I'll find under Subsection 5 that the statement that has been provided was not a statement that was given or stems from custodial interrogation.
>
> I will find that [appellant] at that time who was not arrested was not physically deprived of his freedom of action in any significant way; that he was not told he could not leave; and that although there were a number of officers there who were there as was presented by Detective Arnold for purposes of evaluating those items that would need to be seized and/or searched and the other officers that were there for officer safety, that presence did not create a situation that would lead a reasonable person to believe that his freedom of movement had been significantly restricted. In fact, there was no indication that he was restricted from leaving at all.
>
> Further, I will find that if there is any indication, and there's not, that there was a custodial interrogation, I will further find that the [legal] warnings were complied with as provided for in 38.22; that there was an electronic recording that was not visual but was audio only; that prior to any statements being provided that [appellant] was provided with his [legal] warnings as set out in 38.22, and as he just testified that he freely and voluntarily knowingly waived his rights and began to visit with Detective Arnold.

---

[53] *See* TEX. CODE CRIM. PROC. ANN. art. 38.22, § 6 (Vernon Supp. 2018) ("If [a] statement has been found to have been voluntarily made and held admissible as a matter of law and fact by the court in a hearing in the absence of the jury, the court must enter an order stating its conclusion as to whether or not the statement was voluntarily made, along with the specific finding of facts upon which the conclusion was based, which order shall be filed among the papers of the cause."); *Urias v. State*, 155 S.W.3d 141, 142 (Tex. Crim. App. 2005). A trial court may dictate its findings and conclusions into a reporter's record that is included in the appellate record. *See Mbugua v. State*, 312 S.W.3d 657, 668 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd).

The recording is capable of making an accurate recording. The operator was competent and the recording hasn't been altered in any respect. All of the voices on the recording are identified and that prior to 20 days of the date of these proceedings that audio was provided to counsel for review and listening.

And as such, even if there had been custodial interrogation, it would be -- it would not be suppressed and would be permitted to be admitted. But as I indicated, I'm finding under Subsection 5 that this does not stem from custodial interrogation and, therefore, is admissible.

Appellant first argues that he was "under arrest" at the time of his interview with Detective Arnold and Agent Lewis because "[a] large number of law enforcement officers entered [his] residence early in the morning and exercised physical control over [him]"; the officers "sought out [a]ppellant and escorted him outside [of] his home and into a police vehicle waiting in the street"; "he was accompanied by at least two detectives who interrogated him for nearly an hour"; he was "aware [that] he was the focal point of the investigation"; he testified that "he believed [that] he was in custody"; he was "denied access to food, drink, and a restroom break while in the police vehicle"; and "[a] reasonably prudent person would certainly believe [that he] w[as] about to be transported to jail" and "would not feel [that he] would be able to invoke [his] constitutional right to counsel, to remain silent, or [to] terminate the interrogation."

The United States Constitution prohibits the use of statements made by a criminal defendant against himself if they are obtained through custodial

interrogation without the necessary procedural safeguards to secure the Fifth Amendment right against self-incrimination. *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 1612 (1966); *Jones v. State*, 119 S.W.3d 766, 772 (Tex. Crim. App. 2003). Similarly, the Texas Code of Criminal Procedure precludes the State's use of the statements of a criminal defendant against himself obtained through a custodial interrogation without compliance with procedural safeguards. TEX. CODE CRIM. PROC. ANN. art. 38.22 (Vernon Supp. 2018). Notably, however, an individual's Fifth Amendment rights do not come into play if the person is not in custody and any investigation is not yet custodial, and neither *Miranda* nor article 38.22 warnings are required before questioning. *Herrera v. State*, 241 S.W.3d 520, 526 (Tex. Crim. App. 2007); *Melton v. State*, 790 S.W.2d 322, 326 (Tex. Crim. App. 1990); *White v. State*, 395 S.W.3d 828, 834 (Tex. App.—Fort Worth 2013, no pet.).

"Custody" for purposes of article 38.22 is consistent with the meaning of "custody" for purposes of *Miranda*. *Gardner v. State*, 433 S.W.3d 93, 98 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd). The appropriate inquiry as to whether a person is in "custody," for purposes of their right to receive legal warnings, is "whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125, 103 S. Ct. 3517, 3520 (1983) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S. Ct. 711, 714 (1977)); *see also Gardner v. State*, 306 S.W.3d 274, 293–94 (Tex. Crim.

45

App. 2009). A "custodial interrogation" is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom . . . in any significant way." *See Herrera*, 241 S.W.3d at 525. The determination of custody is made on a case-by-case basis considering all the surrounding circumstances. *Dowthitt v. State*, 931 S.W.2d 244, 255 (Tex. Crim. App. 1996). A person is in custody only if, under the circumstances, an objectively reasonable person would believe that his freedom of movement was restrained to the degree associated with a formal arrest. *Id.* at 254.

Generally, a person's detention may constitute custody for purposes of *Miranda* and article 38.22: (1) when an individual is physically deprived of his freedom of action in any significant way; (2) when a law enforcement officer tells the person that he is not free to leave; (3) when a law enforcement officer creates a situation that would lead a reasonable person to believe that his freedom of movement has been significantly restricted; and (4) there is probable cause to arrest the person and law enforcement officers do not tell the person that he is free to leave. *Id.* at 255. In the first three situations, the restriction upon freedom of movement must amount to the degree associated with an arrest rather than an investigative detention. *Id.* Under the fourth situation, the existence of probable cause must be manifested to the person. *Id.* Such a concession, however, does not automatically establish a custodial interrogation; rather, it is a factor to consider, together with

other circumstances, to determine whether a reasonable person would believe that he is under restraint to a degree associated with an arrest. *Id.*

Additional circumstances to consider in determining whether an interrogation is custodial include whether the criminal defendant arrived at the interrogation place voluntarily, the length of the interrogation, any request by the defendant to see relatives or friends, and the degree of control exercised over him. *Gardner v. State*, 433 S.W.3d at 98; *Ervin v. State*, 333 S.W.3d 187, 205 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd). We may also examine such things as "the location of the questioning, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the [defendant] at the end of the questioning." *Howes v. Fields*, 565 U.S. 499, 509, 132 S. Ct. 1181, 1189 (2012) (internal citations omitted); *see also Copeland v. State*, No. 06-17-00193-CR, 2018 WL 1801324, at *5 (Tex. App.—Texarkana Apr. 17, 2018, no pet.) (mem. op., not designated for publication).

Simply because an interrogation begins as "noncustodial" does not preclude custody from arising later if the conduct of law enforcement officers causes "a consensual inquiry to escalate into [a] custodial interrogation." *Dowthitt*, 931 S.W.2d at 255. A defendant bears the burden at trial of proving that his statements were the product of a custodial interrogation. *Herrera*, 241 S.W.3d at 526.

At the suppression hearing, Detective Arnold testified that on May 12, 2015, he and Agent Lewis interviewed appellant in a silver Dodge Durango sport utility vehicle ("SUV") that was parked outside of appellant's residence. In addition to Arnold and Lewis, Detectives Vlasek and Cox, Agent Erickson, and two uniformed PPD law enforcement officers were present at appellant's home that day to aid in the serving of a search warrant on appellant. These additional individuals did not participate in appellant's interview. Instead, they secured the scene and searched for electronic devices or "anything tending to show that child pornography was present" in appellant's home.

Before interviewing appellant, Detective Arnold identified himself, as did Agent Lewis, and Arnold told appellant that he was not under arrest. Although appellant was not "in custody," Arnold "read him his [legal] rights," including informing him that he had a "right to remain silent" and "anything [that] he said c[ould] and w[ould] be used against him in a [c]ourt of law." Arnold did not tell appellant that he was recording their conversation. At the time of the interview, Arnold did not know whether appellant had child pornography on any electronic devices in his home; he only knew that "child pornography [had] c[o]me from an IP address that returned to [appellant's] physical [home] address." In other words, at the time of appellant's interview, Arnold was "not a hundred precedent sure that

[appellant] even possessed child pornography." During the course of the interview, appellant admitted to possessing child pornography.

Following appellant's interview, Detective Arnold and Agent Lewis walked appellant back inside his home. They, along with Detectives Vlasek and Cox, Agent Erickson, and the two uniformed PPD law enforcement officers, then remained at appellant's home "[s]till searching, identifying . . . electronic evidence," and "triaging th[at] evidence," in order to "eliminate" those electronic devices in appellant's home that did not contain child pornography. As the officers searched his home, appellant, following his interview, sat in "a common area" of the home with a uniformed PPD officer. According to Arnold, however, that officer was "not sitting on top of [appellant]"[54] and he was free to leave the home. In fact, the law enforcement officer sat with appellant for safety purposes only, specifically to prevent appellant from "run[ning] around the house," "access[ing] . . . weapons," or "interfer[ing] with the piles of electronic evidence that [were] being processed by the forensic analysts." After officers completed their search of appellant's home and seized certain electronic devices, they left appellant at his home. Appellant was not

---

[54]     The other uniformed PPD officer stood at the front door of appellant's home "to prevent people coming back into the house once they [had] le[ft]."

arrested that day, and at no point, during the entirety of the time that law enforcement officers were at his home, was appellant ever placed in handcuffs.[55]

Appellant testified that on May 12, 2015, law enforcement officers arrived at his residence "early in the morning" to search his home pursuant to a search warrant. Appellant spoke with Detective Arnold that day, although he did not know, at the time, that Arnold was recording his interview. Appellant's interview lasted thirty-five to forty minutes, he was "read . . . [his] rights" prior to the interview, and he chose to speak to Arnold. Appellant was not threatened or coerced into speaking with Arnold, but he felt intimated. During the interview, appellant informed law enforcement officers that there were firearms in his home.

After his interview, appellant did not feel that he could leave his home because a law enforcement officer sat next to him by the pool table in his house and he was told "to sit there . . . and not to move." However, only one officer stayed with appellant, while the other officers searched the home. None of the law enforcement officers told appellant that he could leave, but appellant received water when

---

[55] Appellant's audio-recorded interview further reveals that at the end of the interview, Detective Arnold told appellant that he could go back inside of his house, sit downstairs, "relax," and "hang out" while law enforcement officers finished looking at his electronic devices. Arnold also told appellant that officers would likely take some of his electronic devices "back [to] the station" so that he did not have to "spend the entire day" with officers in his home. Law enforcement officers permitted appellant to watch television, did not arrest him on May 12, 2015, and left his home at the conclusion of their search.

50

requested. And although he never asked to use the restroom, he knew that he could do so. Appellant believed that he was under arrest. However, he was not placed in handcuffs, and he was not told that he "under arrest" that day. (Internal quotations omitted.)

The question we must determine in regard to custody is whether, under the circumstances, an objectively reasonable person would believe that his freedom of movement was restrained to the degree associated with a formal arrest. *Dowthitt*, 931 S.W.2d at 254; *Wilson v. State*, 442 S.W.3d 779, 784 (Tex. App.—Fort Worth 2014, pet. ref'd). Initially, we note that appellant's subjective belief that he was "under arrest" is irrelevant. *See Bartlett v. State*, 249 S.W.3d 658, 669 (Tex. App.—Austin 2008, pet. ref'd); *Hernandez v. State*, No. 01-13-00245-CR, 2014 WL 3607849, at *9 (Tex. App.—Houston [1st Dist.] July 22, 2014, no pet.) (mem. op., not designated for publication). Further, here, after law enforcement officers arrived at him home to execute a search warrant, appellant voluntarily agreed to speak with Detective Arnold and Agent Lewis.

The interview, which lasted approximately thirty-four minutes, took place in a silver Dodge Durango SUV that was parked outside of appellant's residence with only Detective Arnold and Agent Lewis present. *Cf. Ervin*, 333 S.W.3d at 208 ("[T]he four hour period of time at the police station does not constitute a length of time that would cause a reasonable person to believe she was in custody . . . ."); *see*

*also Copeland*, 2018 WL 1801324, at *6 (facts tending to show interrogation noncustodial included short length of interview). Appellant was never placed in handcuffs or restrained in any way before, after, or during his interview, and Arnold told appellant that he was not being arrested. *See Taylor v. State*, 509 S.W.3d 468, 481 (Tex. App.—Austin 2015, pet. ref'd) (defendant not in custody where he voluntarily agreed to interview and told not being arrested); *Ervin*, 333 S.W.3d at 211 (defendant not in custody where she voluntarily gave statements to law enforcement officers and remained unhandcuffed throughout statements); *Gardner*, 433 S.W.3d at 99 (defendant not in custody when he willingly accompanied law enforcement officers to patrol car and never handcuffed). The entire interview was conducted in a non-confrontational manner, and appellant was not pressured or coerced into speaking with Arnold and Lewis. *See Copeland*, 2018 WL 1801324, at *6 (facts tending to show interrogation noncustodial included "only one law enforcement officer present during the questioning," interview conducted in "non-confrontational tone," and officer "did not pressure or coerce confession" from defendant).

Although appellant was not offered water or access to the restroom during the interview, he also did not request either. *See id.* (facts tending to show interrogation noncustodial included defendant making no requests to leave room for any reason); *State v. Perez*, No. 14-16-00690-CR, 2017 WL 5505855, at *7 (Tex. App.—Houston

52

14th Dist.] Nov. 16, 2017, no pet.) (mem. op., not designated for publication) (considering defendant "did not ask for food or drink"); *Gardner*, 433 S.W.3d at 99 (defendant did not ask to use telephone and officers did not refuse to allow defendant to use telephone). Upon reentering his home after his interview, appellant requested water, which he received. And appellant admitted that he knew that he would be permitted to use the restroom if he had needed to do so. *See Colvin v. State*, 467 S.W.3d 647, 658–59 (Tex. App.—Texarkana 2015, pet. ref'd) (defendant not denied food, water, or other facilities tended to show interrogation noncustodial); *Johnson v. State*, 299 S.W.3d 491, 495 (Tex. App.—Tyler 2009, no pet.) (defendant's "requests for water and breaks were heeded").

Further, prior to his interview, Detective Arnold was "not a hundred percent sure that [appellant] even possessed child pornography." *See Nickerson v. State*, 478 S.W.3d 744, 754–55 (Tex. App.—Houston [1st Dist.] 2015, no pet.) (defendant not in custody where he voluntarily agreed to give statement, treated fairly, and officers not certain he committed offense prior to interview). And although appellant admitted to possessing child pornography during the course of his interview, this is not dispositive of the custody determination. *See Trejos v. State*, 243 S.W.3d 30, 46–47 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd) (defendant not in custody although he "admitted . . . his role in [complainant's] death," officer considered him to be suspect, and his statements made during interview provided sufficient probable

53

cause to arrest him); *Garcia v. State*, 106 S.W.3d 854, 858–59 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd) (defendant not in custody, despite statements giving officers probable cause to arrest him).

Following appellant's interview, he was walked back inside his home. *See Taylor*, 509 S.W.3d at 481 (defendant not in custody where not arrested and left at conclusion of interview); *Ervin*, 333 S.W.3d at 211 (defendant not in custody where she returned home after making statement). And Detective Arnold told appellant that he could sit downstairs, "relax," and "hang out" while officers finished examining his electronic devices. Because, at the time, law enforcement officers were still searching the home and collecting evidence, appellant sat in "a common area" of the home with a uniformed PPD officer for safety purposes and to avoid any interference with the officers' search. *See Gardner*, 433 S.W.3d at 99 (defendant not in custody although "officers escorted [him] to avoid any interference with the officers executing the search warrant"); *cf. Turner v. State*, 252 S.W.3d 571, 580 (Tex. App.—Houston [14th Dist.] 2008, pet. ref'd) (placing defendant in handcuffs for officer safety purposes did not mean in custody). Appellant had, after all, informed law enforcement officers that he had firearms in his home.

According to Detective Arnold, appellant, at all times, was free to leave. Arnold informed appellant that law enforcement officers would likely seize some the electronic devices found in the home so that appellant did not have to "spend the

entire day" with officers. Officers permitted appellant to watch television while they searched the home, did not arrest appellant on May 12, 2015, and left appellant at his home at the conclusion of their search. *See Gardner*, 433 S.W.3d at 99 ("[O]fficers left [defendant's] home after executing the warrant and did not arrest [defendant] until several weeks later . . . . This fact weighs heavily in favor of finding that [defendant] was not in custody [at the time of his interview].").

Having examined the totality of the circumstances, we conclude that there is nothing in the record to suggest a restraint of appellant's freedom of movement of the degree associated with a formal arrest. Accordingly, we hold that the trial court did not err in denying appellant's motion to suppress his statement.

We overrule appellant's first issue.

## Conclusion

We affirm the judgments of the trial court.


Terry Jennings
Justice

Panel consists of Justices Jennings, Higley, and Massengale.

Massengale, J., concurring solely in the judgment.

Do not publish. TEX. R. APP. P. 47.2(b).